

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NEIL SCHULTZ., | ) |
| | ) |
| Plaintiff | ) |
| | ) No. 10 C 71 |
| v. | ) |
| | ) The Honorable William J. Hibbler |
| | ) |
| iGPS Co., LLC AND SCHOELLER AREA SYSTEMS, INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Neil Schultz alleges that Defendants iGPS Company and Schoeller Area Systems have been infringing on two of his patents, U.S. Patent 6,745,703 ('703 patent) and U.S. Patent 6,758,148 ('148 patent) (collectively, the patents). Defendants move to dismiss Schultz's claims, arguing that Schultz lacks standing to assert patent infringement because he does not hold enforceable title to the patents.

I. Background

The history of the '703 patent and the '148 patent begins approximately in the Fall of 2000. Around that time, Bruce Torrey began working for CHEP International (CHEP), which was a large pallet pooling company. Prior to his employment with CHEP, Torrey had worked for General Electric to develop fire-resistant pallets. While working at GE, Torrey had consulted with Schultz and VTEC Laboratories (VTEC) regarding the fire-resistant pallets. Schultz had formed VTEC in 1981 and was

1

its Executive Director, and Owner. Torrey continued to work on the fire-resistant pallets when he shifted employers from GE to CHEP.

In early 2001, Torrey reconnected with Schultz and asked him to assist CHEP to test and further develop the fire-resistant pallets that Torrey was working on. Shortly thereafter, CHEP and VTEC entered into a Confidential Disclosure Agreement (2001 CDA). Schultz signed the 2001 CDA, but did so in his capacity as the Executive Director of VTEC. The 2001 CDA specifically names VTEC as the Disclosee that is bound by the agreement and does not name Schultz as a party to the agreement. The 2001 CDA contains the following relevant provisions:

> 4. [CHEP's] Property Rights
>
> [CHEP] shall have sole and exclusive ownership of all right, title, and interest in and to the information, or any additional information or know how resulting from the information disclosed under this Agreement, including ownership of all patents, trade secretes, copyrights, or trademarks pertaining thereto, subject only to the rights and privileges expressly granted in writing by [CHEP.] [VTEC] agrees to assign to [CHEP] all right, title, and interest that it may obtain in the information as a result of the disclosure by [CHEP] or [VTEC] under this Agreement.
>
> 5. Developments and Improvements
>
> Any improvements, modifications, adjustments, prototypes, or other developments made by [VTEC] regarding the subject matter of the information, prior to or after the execution of this Agreement, is hereby assigned by [VTEC] to [CHEP.] If any of these improvements, modifications, adjustments, prototypes, or other developments made by [CHEP] to the information becomes the subject of one or more patent application disclosures, the information rights and any associated patent rights therein shall be assigned from [VTEC] to [CHEP.] [VTEC] agrees to cooperate in the preparation and execution of any documents necessary to assign these information rights and related patent rights.
>
> 6 Further Assurances
>
> Upon request of [CHEP], [VTEC] shall take such further actions, and shall cause its personnel, agents, and employees to take such further actions, including execution and delivery of instruments of conveyance, that [CHEP] may reasonably deem necessary or desirable to accomplish or evidence more further any transfer of right, title, or interest discussed in

paragraphs 4 and/or 5 of this Agreement, or any other transfer necessary to fulfill the intent of this Agreement.

A few days after CHEP and VTEC entered into the 2001 CDA, CHEP sent Torrey drafts of two patent applications for his review. By October 2001, CHEP was prepared to file its patent application. In early October 2001, CHEP provided Torrey with the final patent specifications and declarations to be filed in conjunction with the application. It also provided Torrey with assignment documents to assign his rights to the patent to CHEP. In the cover letter to Torrey, CHEP acknowledged that there were "2 inventors" for the patents and that Schultz, the second inventor, did not wish to assign his rights in the patent to CHEP. CHEP expressed to Torrey its disappointment in Schultz's refusal to assign his rights to it. Nevertheless, CHEP never sought to invoke the Further Assurances clause to request that VTEC cause Schultz to transfer his interest in the patents to it.

In 2003, while the patent applications were still pending, CHEP contacted Torrey to obtain both his and Schultz's signatures to complete patent applications in Canada, New Zealand, Europe, and South Africa, recognizing Schultz's interest in the pending application. In 2007, CHEP still considered Schultz to be a co-patentee and sought his consent to reassign its interest in the patents from CHEP International, Inc. to CHEP Technology Pty, Ltd.

In July 2008, the '703 and '148 patents became subject to the payment of their four-year maintenance fees. CHEP determined that the patents' usefulness did not outweigh the cost of maintaining the patents and deliberately failed to pay the maintenance fee on each patent. In fact, CHEP informed the PTO that it no longer had an interest in maintaining the patents. At the end of 2008, Schultz, apparently unaware that CHEP had failed to pay the maintenance fees on the patents, came to believe that one of the Defendants, iGPS Co., was infringing upon the patents. After an investigation,

3

Schultz discovered that CHEP had failed to pay the maintenance fees on the two patents. Schultz then contacted his patent counsel and instructed him to attempt to revive the expired patents. Based on the information that Schultz provided, Schultz's attorney believed that CHEP's rights in the patents had permanently expired, but that Schultz's rights in the patents were revivable.

Accordingly, Schultz's attorney petitioned for the PTO to accept unintentionally delayed payment of maintenance fees on Schultz's behalf, filing an e-petition under 37 C.F.R. § 1.378(c). The PTO's Guidelines for such petitions state that the petition must be filed by an attorney registered to practice before the PTO, a sole patentee, a joint patentee who has the consent of other patentees, all joint patentees, or a sole assignee.[1] Schultz's attorney completed the e-petition, selecting the box indicating that the petition was filed by an attorney registered to practice before the PTO. In addition, Schultz's attorney represented that the patentee was a "small entity" and did not indicate that patentee was no longer eligible for small entity status. Both Schultz and his attorney believed, when the e-Petition was filed, that Schultz was the sole owner of the patents because CHEP had abandoned its ownership interest. The PTO granted Schultz's petitions and reinstated the patents as of February 27, 2009.

Later in 2009, CHEP made clear to Schultz that it did not want to participate in the prosecution of the patents and assigned any rights it may have had in the patents to Schultz.

---

[1] Defendants suggest that the Manual of Patent Examining Procedure (MPEP) provides that "the combination of all partial assignees and inventors retaining ownership interest is needed" to complete the § 1.378(c) e-petition. See MPEP § 324. Defendants imply that § 324 would have required CHEP to join in Schultz's petition if it had an interest in the patents and because it did not Schultz implicitly represented to the PTO that he was the sole owner of the patents. Defendants argue that § 2590 of the MPEP makes § 324 applicable to Schultz's petition. Section 2590, however, states only that "[a]n *assignee* must comply with the requirements of 37 C.F.R. 3.73(b), which is discussed in MPEP § 324." MPEP § 2590 (emphasis added). As Schultz is not an assignee, § 2590 of the MPEP does not make § 324 applicable to Schultz's petition to revive his interest in the patent.

4

## II. Standard of Review

Standing is an essential component of Article III's case-or-controversy requirement, and without it the court is without jurisdiction to decide the plaintiff's claims. *Schirmer v. Nagoode*, 621 F.3d 581, 584 (7th Cir. 2010); *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). As a jurisdictional requirement, the plaintiff bears the burden of establishing his standing to sue. *Apex Digital, Inc.*, 572 F.3d at 443. Whether a party has standing to assert the jurisdiction of a federal court is a question of federal law. *Rifkin v. Bear Stearns & Co.*, 248 F.3d 628, 631 (7th Cir. 2001). In order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010).

Challenges to subject matter jurisdiction are either facial or factual. *Apex Digital, Inc.*, 572 F.3d at 443. A facial challenge requires that the court look to the complaint to determine whether the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. *Id.* A factual challenge, on the other hand, lies where the complaint is formally sufficient but the defendant contends that there is, in fact, no subject matter jurisdiction. *Id.* at 444. Because the issue in a factual challenge to subject matter jurisdiction is the court's power to hear the case, the court is free to weigh evidence submitted on the issue of its jurisdiction and no presumptive truthfulness attaches to the plaintiff's allegations. *Id.* Indeed, the court is "duty-bound" to demand proof of the jurisdictional allegations. *Id.*

## III. Analysis

Defendants' argument that Schultz lacks standing contains two parts. First, Defendants argue that Schultz cannot rely on rights to the patents originating from Torrey because CHEP deliberately

allowed those rights to expire.[2] Second, Defendants argue that Schultz cannot rely on his own rights to the patents. In support, the Defendants argue that the 2001 CDA automatically transferred any interest Schultz had in the patents to CHEP, which then allowed the patents to expire by deliberately failing to pay the maintenance fees on the patents. Because CHEP deliberately allowed the patents to expire, Defendants thus conclude that Schultz could not revive the patents and that the 2009 transfer of rights by CHEP transferred only an interest in the expired patents. Schultz argues in response that the 2001 CDA did not automatically transfer his interest in the patents and that the PTO accepted his petition to revive the patents. Thus, Schultz contends he holds an enforceable right in the patents.

With regard to Defendants' first argument, Schultz responds only briefly, in a footnote, that 35 U.S.C. § 41(c) operates to revive the *patent* and not a patentee's rights (or partial rights) to that patent Schultz offers neither caselaw nor explanation to support his interpretation of § 41(c). Section 41 governs both patent-application fees and maintenance fees. It does not, however, clearly spell out the responsibilities of co-patentees regarding the payment of these fees, the consequences of a single co-patentee's failure to pay the maintenance fee, or the effect of a single co-patentee's effort to revive the patent. Schultz is correct that Sections 41speaks generally in terms of applications, claims or patents and not in terms of a patent holder's individual rights. In this regard, Schultz's interpretation of the statute is reasonable. On the other hand, in speaking in terms of applications, claims or patents, Section 41 implies that the obligation to pay application and maintenance fees is joint and several. And if the obligation to pay fees is joint and several, a single co-patentees deliberate failure to pay the maintenance

---

[2] Defendants seem to argue that the Court's memorandum opinion resolving their Motion For Leave to File Second Amended Affirmative Defenses resolved the issue of whether Schultz can assert rights to the patents originating from Torrey. In resolving that motion, however, the Court treated the facts, as pleaded by the Defendants in their affirmative defenses, as true. Defendants cannot rely on that same presumption here.

fees would seem to preclude its co-patentee from employing Section 41(c) to revive both parties' interest in the patent. The Defendants do not even reply to Schultz's interpretation of § 41(c).

The Court, however, need not resolve whether Schultz's interpretation of Section 41(c) is correct because Schultz is judicially estopped from arguing that his application under § 41(c) revived both his and CHEP's rights in the patents. Judicial estoppel prevents a party from an "about-face." *Brown v. Watters*, 599 F.3d 602, 615 (7th Cir. 2010). It is an equitable concept that prevents a party who prevailed on one ground in a prior proceeding from later repudiating that ground. *Id.* Among other requirements, judicial estoppel requires that the position taken in the subsequent proceeding be clearly inconsistent with the position taken in the prior proceeding. *Id.* Although termed "judicial" estoppel, the doctrine has been applied to parties that obtain favorable results in administrative proceedings. *Chaveriat v. Williams Pipe Line, Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993).

In this case, Schultz took the position before the PTO that the failure to pay the filing fee was inadvertent. However, CHEP had expressly informed the PTO that it wished to let its rights in the patents expire and, knowing this, both Schultz and his attorney believed that CHEP's rights in the patents had expired. Given that knowledge, Schultz could not truthfully claim that the failure to pay the maintenance fees was inadvertent unless he believed both that CHEP's rights to have been permanently expired that he applied only for the reinstatement of his interest in the patents. Further, Schultz represented to the PTO the patentee seeking revival of the patents was a "small entity." But CHEP did not qualify as a "small entity." Thus, Schultz again implicitly represented to the PTO that he sought only his rights in the patents — for otherwise he could not have sought the lower fees afforded to "small entities." Because Schultz was successful in asserting these positions before the PTO

7

in his petition to accept the untimely payment of maintenance fees, the Court finds that he is now judicially estopped from asserting that the PTO reinstated both his and CHEP's rights to the patents.

The Defendants also argue that Schultz cannot assert rights in the patents that belonged to him. The Defendants suggest that the 2001 CDA automatically transferred any rights in the patents that Schultz may have had to CHEP. Thus, the Defendants reason that when CHEP deliberately allowed its rights to the patents, which then included both the rights originating from Torrey and those originating from Schultz, all interest in the patents permanently expired and the PTO's acceptance of Schultz's late payment of the maintenance fees was of no effect. However, the underlying premise of the Defendants' argument (that the 2001 CDA automatically transferred Schultz's rights in the patents to CHEP) is flawed.

The Defendants point out that where a contract expressly grants rights in future inventions, no further acts are required once an invention comes into being and instead the transfer of title occurs by operation of law. *DDB Techs., LLC v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008). Defendants then devote considerable attention to the language of Paragraphs 4, 5, and 6 of the 2001 CDA. Defendants point out that, among other things, those paragraphs "hereby assigns" CHEP the "sole and exclusive ownership" of all patents resulting from the agreement, thus expressly granting rights in future inventions, which causes a transfer of title to the patents by operation of law.

Whether the 2001 CDA automatically transfers rights to CHEP is not relevant, however. The 2001 CDA specifically defines the "disclosee" as VTEC. And Schultz signed the document only as the executive director of VTEC. VTEC, and not Schultz, was the party to the 2001 CDA. Faced with these facts, Defendants make no real argument that Schultz is personally bound by the 2001 CDA. Thus, while the 2001 CDA may indeed operate to automatically transfer any interest that VTEC had in the

8

patents to CHEP, it cannot automatically transfer any interest that Schultz had in the patents because Schultz is not bound by the CDA.

Instead, Defendants suggest that Schultz's rights to the patents were transferred to CHEP by virtue of his fiduciary duty to VTEC. In short, Defendants suggest that because Schultz owed VTEC a fiduciary duty any interest in the patents that he had automatically transferred to VTEC, which then automatically transferred to CHEP, which then expired. Again, the underlying premise of Defendants' argument, that Schultz's rights in the patent were automatically transferred to VTEC by virtue of his fiduciary duty to it, is flawed.

Under New York law, an general employee has no duty to assign rights to an invention made during the course of employment to his employee. *Cahill v. Regan*, 5 N.Y.2d 292, 296-97 (1959). Instead, generally, only an employee who focuses on a specific inventive task or whose contract with an employer requires that the employee assign the rights in any resulting patent to the employer must assign rights to an invention to the employer. *Id.* at 297-98. An exception to this general rule lies where the employee is a general employee but also owes a fiduciary duty to the employer because he is an officer or director of the company. *See, e.g, Gasser v. Infanti Int'l Inc.*, 353 F. Supp. 2d 342, 352-53 (E.D.N.Y. 2005); *Great Lakes Press Corp. v. Froom*, 695 F. Supp. 1440, 1446 (W.D.N.Y. 1987); *Mech. Plastics Corp. v. Thaw*, 197 U.S.P.Q. 651, 654 (N.Y. Sup. Jun. 1, 1977). Such an officer or director "owe[s] the corporation undivided loyalty . . . [and has] no right to take advantage of this position of trust and power to obtain property rights which would conflict with his clear duty to his company. *Mech. Plastics Corp.*, 197 U.S.P.Q. at 654.

Schultz was both the owner and chief officer of VTEC. Thus, under New York law, he had a duty to assign the rights to the patents to VTEC. But this principle only gets the Defendants so far.

While New York law may have imposed a duty on Schultz to assign the rights in the patents to VTEC, nothing in New York law suggests that because Schultz neglected that duty VTEC nevertheless automatically acquired his rights in the patents.

Defendants rely on several New York cases to support their argument, but in each of these cases, a corporation (or its successor-in-interest) brought an breach of fiduciary duty claim against a former executive or sought an injunction to compel the executive to assign the rights to the corporation. For example, in *Great Lakes Press Corp.*, Great Lakes Press was the successor-in-interest to Rendoll Paper Company. *Great Lakes Press Corp.*, 695 F. Supp. at 1442. It argued that a former Rendoll President and CEO had a fiduciary duty to the company to assign all patents and inventions to the company. *Id.* at 1445-47. The court did not find that the executive's rights in the patent had automatically transferred to Rendoll (and then to Great Lakes Press), but rather ordered the defendant to assign all rights in the patents to his former company or its successor in interest. *Id.* at 1448. Similarly, both *Mechanical Plastics* and *Golden Eagle* involved suits by corporations alleging that former executives breached fiduciary duties. *Mechanical Plastics Corp.*, 197 U.S.P.Q. at 652 (stating that plaintiff brought the action against its former president seeking a judgment directing him to relinquish and surrender interest in two inventions). *Golden Eagle/Satellite Archery Inc. v. Epling*, 244 A.D.2d 959, 959 (N.Y. App. Div. 1997) (holding that plaintiff-employer was entitled to summary judgment on breach of fiduciary duty claim based on former CEO's failure to assign patent to it).

Schultz as the sole-shareholder and President of VTEC owed VTEC a fiduciary duty under New York law to assign the patents to the corporation. And arguably, Schultz breached that duty. But the mere fact that Schultz may have breached the duty does not mean that the rights to the patent he acquired as a named inventor on the patent application *automatically* transferred to VTEC. Rather, it

10

means only that VTEC or someone in privity with it (CHEP, for example) could have sued Schultz for breach of fiduciary duty and sought an injunction requiring him to assign the interest in the patents to it. *See Great Lakes Press Corp.*, 655 F.Supp. at 1448-49 (ordering employee to assign interest in patents to successor-in-interest to former employer). Indeed, the very existence of Paragraph 6 of the 2001 CDA seems to have contemplated just such a possibility. Paragraph 6 gave CHEP the right to compel VTEC to "take such further actions . . . and cause its personnel" to transfer interest in the patents to CHEP. CHEP, however, never took such steps.

In fact, when CHEP was completing its patent applications, it expressed to Torrey its disappointment that Schultz would not assign his interest in the patents to it. Further, internal correspondence at CHEP reveals that it believed that Schultz had not assigned his interest in the invention to CHEP or any other entity. When CHEP applied for patents in other countries it listed Schultz as a co-inventor. Quite simply, CHEP and Schultz acted as if they were co-applicants throughout the application process and co-patentees once the patents issued and not as if Schultz's fiduciary duty to VTEC and VTEC's agreement with CHEP operated together to transfer Schultz's interest in the patents to CHEP.

Merely because Schultz should have assigned his interest in the patents to VTEC and merely because CHEP could have (under either New York's fiduciary duty law or Paragraph 6 of the 2001 CDA requiring VTEC to cause its employees to assign their interests to CHEP) required Schultz to assign his interest to CHEP does not mean that Schultz's interest automatically transferred to CHEP. The Court finds that the 2001 CDA does not apply to Schultz and that even though Schultz may have had a fiduciary duty to transfer his interest in the patents to VTEC, neither VTEC nor CHEP compelled

him to do so. Consequently, the Court concludes that Schultz maintained his own interest in the patents.

Because Schultz retained his interest in the patents and because the PTO revived the patents after Schultz maintained that the failure to pay the maintenance fee was inadvertent, the Court finds that Schultz has met his burden of demonstrating that he had an enforceable interest in the patents at the time he filed this suit. The Court therefore DENIES Defendants' Motion to Dismiss for lack of Standing.

IT IS SO ORDERED.

8/16/11
Dated

Hon. William J. Hibbler
U.S. District Court